USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-18-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

MELAHN MURRAY,

Defendant.

---

18 Cr. 606 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The defendant, Melahn Murray, was indicted on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 2. The defendant has moved to suppress (1) two firearms seized when New York City Police Department ("NYPD") officers searched the residence of Shanequa Fluellen, the mother of the defendant's son; and (2) postarrest statements the defendant made after the search claiming possession of the firearms. The defendant contends that the officers' search violated his Fourth Amendment rights and that the postarrest statements he made were tainted by the officers' illegal search.

On November 30, 2018, the Court held an evidentiary hearing in connection with the motion to suppress. The Government presented the testimony of three NYPD officers: Sergeant Frank Burns, Detective Kenneth Faulkner, and Detective Richard Pengel. Defense counsel called Shanequa Fluellen as a witness. Having reviewed the evidence and assessed the credibility of the

witnesses, the Court makes the following findings of fact and reaches the following conclusions of law.

I.

Fluellen had a protective order against the defendant. The temporary order of protection, an extension of a prior order, required the defendant from July 17, 2018, until August 7, 2018, among other things, to stay away from Fluellen and her apartment. GX F. Fluellen testified that, on July 22, 2018, she was in need of someone to watch her children, including the defendant's son. Tr. 155-57. Because Fluellen's typical babysitter – her cousin – told Fluellen at the last minute that she could not babysit the children, Fluellen contacted the defendant asking if he could watch them. Tr. 156-57. Fluellen stated that she initially had trouble reaching the defendant; she testified that the defendant did not want to communicate with her or go to her apartment because of the order of protection against him. Tr. 157. According to Fluellen, the defendant eventually arrived at her apartment around 11:30pm that night. Tr. 156-58. He stayed overnight at her apartment in a room separate from Fluellen. Tr. 158. The search at issue occurred the following morning.

A.

The three NYPD officers that the Government called as witnesses testified credibly, and for the most part

2

consistently, about material facts related to the search. On or about July 19, 2018, an individual informed law enforcement officials that the defendant threatened her and her then-boyfriend by messaging them a picture of two firearms with a note reading, "Hi Wally Pull Up." Tr. 47-48, 105; GX A. That individual also informed officials that the defendant was staying at Fluellen's apartment ("the apartment") and that the defendant stored at least one of the firearms pictured in the message in a broken microwave in the apartment. Tr. 46-49, 62, 105, 113-14.

On July 23, 2018, around 6:45am or 7:00am, Detective Faulkner and Detective Pengel arrived at the apartment. Tr. 49, 106. They knocked on the door and heard movement inside the apartment, including what sounded like doors opening and closing. Tr. 54, 106-07. About five minutes later, Fluellen answered the door. Tr. 54, 107. Detective Faulkner told Fluellen that he needed to speak with the defendant and asked permission to enter her apartment. Tr. 54, 126-27. Fluellen told the officers that the defendant was not in her apartment because she had a protective order against him and stated that she needed to get dressed. Tr. 54-55, 107; GXs F, G. Fluellen then went to get dressed, and the officers waited in the hallway outside the

3

apartment. Tr. 55-56, 83, 107-08.¹ When Fluellen returned to the door, Detective Faulkner told her that he and Detective Pengel were at the apartment to get the defendant in connection with an open complaint against the defendant and asked Fluellen's permission to enter. Tr. 56, 83, 108, 125-26. Detective Faulkner also mentioned that he had an investigation card on the defendant. Tr. 126. Fluellen gave verbal permission to the officers to enter the apartment. Tr. 13-14, 57, 85, 94 109.

Upon entering the apartment, Detective Faulkner found the defendant hiding in a closet. Tr. 28, 58-59, 86-87. Detective Faulkner ordered the defendant out of the closet and placed the defendant in handcuffs. Tr. 58-59. Fluellen told the officers that they could search the apartment, including the defendant's

---

¹ The parties dispute whether the officers were both in the hallway outside of the apartment or whether one was in the apartment's doorway while Fluellen went to get dressed. Detective Faulkner testified that he was in the "threshold of [the] door in the hallway," and that Detective Pengel was "[n]ext to [him] in the hallway in the threshold of the door." Tr. 55. Detective Faulkner also stated that he was "mostly in the hallway," or "outside in the hallway." Tr. 55-56, 83. Detective Pengel testified that he and Detective Faulkner were in the hallway. Tr. 108. This testimony indicates that the detectives were mostly in the hallway before Fluellen returned or only minimally crossed the threshold. While it is true that crossing the threshold of a home without a warrant or an exception to the warrant requirement is a violation of the Fourth Amendment, see, e.g., United States v. Bartee, No. 13cr365, 2013 WL 6164339, at *7 (S.D.N.Y. Nov. 12, 2013), in this case any such violation is of no help to the defendant. For the reasons explained below, the defendant lacks standing to complain about any search of Fluellen's apartment because of the order of protection against him. Moreover, any Fourth Amendment violation at the threshold of the apartment did not taint the ultimate seizure of the weapons which, as discussed below, occurred only after Fluellen voluntarily consented to the search of her apartment and voluntarily signed a written consent-to-search form, and after any taint from crossing the threshold had dissipated. See United States v. Snype, 441 F.3d 119, 132-35 (2d Cir. 2006); Bartee, 2013 WL 6164339 at *11-12.

4

possessions in the apartment, and she gave the officers a bin and bags that she said belonged to the defendant. Tr. 61, 90, 92, 111-13, 130. Fluellen also told the officers, contrary to her testimony at the hearing, that the defendant had contacted her a few days before and asked if he could stay at her apartment because he had been evicted from his apartment. Tr. 60-61. After this, the officers searched a microwave in the kitchen and did not find a firearm. Tr. 61-62, 90, 113. Fluellen stated that she had seen the defendant with a firearm before, but not on that day. Tr. 114. According to Detective Pengel, Detective Faulkner told Fluellen that the officers could obtain a search warrant for anything found in the apartment and that she might be held responsible for what was found. Tr. 115. Detective Faulkner did not recall whether he said this. Tr. 63. Detective Faulkner testified that he might have also mentioned to Fluellen that the Administration for Child Services gets involved in cases where a firearm is found in an apartment with children present, but he could not recall definitively whether he said this. Tr. 63. Rather than search the apartment further, the officers called their supervisor, Sergeant Burns, and asked him to bring a consent-to-search form to the apartment. Tr. 63.

Sergeant Burns arrived with the form in about twenty to thirty minutes. Tr. 23-24, 64, 116. He called two additional officers to the scene. Tr. 26-27, 65, 138. One of the officers

5

advised Fluellen of her right to refuse signing the consent-to-search form. Tr. 66-67, 118, 141-42. The form also included a section describing her right to refuse to consent to the search. See GX B. Fluellen appeared to read and understand the form, and then signed it. Tr. 14, 17-19, 30-32, 42, 67, 117-18, 152. She was cooperative at the time she signed the form and did not hesitate or refuse to provide her signature at any point. Tr. 15, 19, 43, 66-67, 117-18, 141-42, 152. Fluellen also wrote a statement on the back of the consent form stating, "I Shanequa Fluellen gave NYPD permission [to] look throug[h] my home . . . . [N]othing in the house belongs to me that was found. I allowed [the defendant] to come stay because he got kicked out and when he came he had one bin an[d] 2 bags." Tr. 19-20, 94-95, 120; GX D. This statement was consistent with what Fluellen had told the officers.

After Fluellen signed the form, Detective Pengel asked her where any firearms might be located. Tr. 118-19. Fluellen said the defendant might have put a firearm in a bedroom closet. Tr. 118-19. Detective Pengel then searched the closet. Tr. 119. Meanwhile, Detective Faulkner searched the kitchen. Tr. 67, 120. Faulkner found two loaded firearms in a kitchen cabinet about seven feet from the floor. Tr. 67-68. The officers believed that these firearms were the same ones pictured in the message the

6

defendant had sent to the individual who initially contacted law enforcement about the defendant. Tr. 67-69; GX C.

Detectives Pengel and Faulkner then took the defendant to the precinct. Tr. 69, 96. Detective Faulkner and at least one other officer was present for the defendant's interview at the precinct. Tr. 69. The defendant was provided with water and a cigarette and was not handcuffed during his interview. Tr. 71. An officer read the defendant his <u>Miranda</u> rights, and the defendant signed a form waiving those rights. Tr. 69-71, 96-98; GX E. During the interview the defendant admitted that the firearms were his and he stated that he possessed them for his protection. Tr. 71.

**B.**

Fluellen's recounting of the search differed markedly from that of the officers. She testified that, after the officers initially knocked on her door and she told them she had to get dressed, one of the officers put his foot in the doorway to prevent the door from closing when she retreated into the apartment to get dressed. Tr. 161. According to Fluellen, the officers told her they had a "body warrant" for the defendant and then entered the apartment without her permission. Tr. 161. But the officers credibly denied even knowing what a "body warrant" is, much less telling her that they had such a document. Tr. 56, 108. Fluellen also testified that the officers

7

told her that they could take and charge her children and threatened to "tear the house up" if she did not consent to a search. Tr. 166, 170. As to the written consent form, Fluellen testified that she never read the form and that the statement she wrote on the back of the form was dictated by the officers, who told her to write it. Tr. 172-73.

Fluellen's testimony about the search of the apartment cannot be relied upon because it is not credible. Fluellen admits that she lied to Detective Faulkner and Detective Pengel by telling them that the defendant was not in the apartment. Tr. 186. She testified that she lied "[b]ecause she had an order of protection against [the defendant], and he was not supposed to be in the home." Tr. 186. Fluellen also testified that the statement she wrote on the back of the consent form was false. She stated that the defendant did not get "kicked out" of anywhere to her knowledge and that he did not arrive at the apartment with one bin and two bags – the defendant had left the bin and bags in the apartment in April 2018. Tr. 182; GX D. But Detective Faulkner testified credibly that Fluellen said at the time of the defendant's arrest that the defendant had been evicted from his apartment. Tr. 60-61. Fluellen testified at the hearing that she wrote a false statement because she thought she would otherwise "get in . . . trouble by allowing [the defendant] in her home" despite the protective order against

8

him. Tr. 183, 185. This testimony belied her earlier testimony that the officers dictated the statement she wrote on the back of the consent form. The most credible explanation is that Fluellen told the officers that the defendant had been evicted from his apartment and that Fluellen included that detail in the voluntary statement she wrote out for the officers as part of her attempt to justify the defendant's presence in her apartment.

Moreover, in her declaration submitted in connection with the motion, Fluellen states that the defendant brought "two bags with him" to the apartment when he arrived on July 22, 2018. Fluellen Decl. ¶ 3. At the hearing, Fluellen admitted that the defendant had left the bags in the apartment in April 2018. Tr. 182. Fluellen testified at the hearing that she made the false statement in her declaration because she had already written it in the statement she provided to the officers. Tr. 200.

### C.

The Government first contends that the defendant's motion to suppress must be denied because he lacks standing to assert a violation of the Fourth Amendment. Although the defendant was an overnight guest at the apartment, the Government argues that the defendant had no reasonable expectation of privacy while at the very apartment covered by the order of protection against him. The Government next claims that, in any event, Fluellen

9

consented to the officers' search of the apartment, and there was no Fourth Amendment violation. The Government argues that, because there is no basis to suppress the fruits of the search of the apartment, the defendant's subsequent statements to the officers should not be suppressed. The Government's arguments are persuasive, and the defendant's motion to suppress is **denied**.

## II.

A defendant has standing to claim the protection of the Fourth Amendment when the defendant "has a legitimate expectation of privacy in the invaded place." Minnesota v. Olson, 495 U.S. 91, 95 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). A legitimate expectation of privacy exists where the defendant has a subjective expectation of privacy that society is prepared to accept as objectively reasonable. See id. at 95-96; United States v. Hayes, 551 F.3d 138, 143 (2d Cir. 2008). Thus, the two firearms and the defendant's postarrest statements in this case may be suppressed only if the defendant had both a subjective and objectively reasonable expectation of privacy at Fluellen's apartment. See United States v. Pena, 961 F.2d 333, 340 (2d Cir. 1992) (explaining that the defendant must have standing through a legitimate expectation of privacy to suppress seized evidence and the defendant's postarrest statements).

Although an overnight guest at another's residence may have a legitimate expectation of privacy at that residence, Olson, 495 U.S. at 100, an active protective order prohibited the defendant in this case from being at the very apartment searched, GX F. The courts that have considered the issue have held unanimously that a defendant does not have a legitimate expectation of privacy in a place from which a protective order excludes the defendant. See, e.g., United States v. Schram, 901 F.3d 1042, 1046 (9th Cir. 2018); United States v. Cortez-Dutrieville, 743 F.3d 881, 884-85 (3d Cir. 2014); Raffone v. Nugent, No. 13cv1589, 2016 WL 199399, at *3 (D. Conn. Jan. 15, 2016); United States v. Conshafter, No. 12cr22, 2012 WL 3236755, at *2 (E.D. Tex. July 25, 2012), report and recommendation adopted, No. 12cr22, 2012 WL 3236740 (E.D. Tex. Aug. 7, 2012); United States v. Dye, No. 10cr221, 2011 WL 1595255, at *5 (N.D. Ohio Apr. 27, 2011), aff'd, 538 F. App'x 654 (6th Cir. 2013); Washington v. St. Albans Police Dep't, 30 F. Supp. 2d 455, 457-58 (D. Vt. 1998); Commonwealth v. Morrison, 710 N.E.2d 584, 586 (Mass. 1999); State v. Stephenson, 760 N.W.2d 22, 25-27 (Minn. Ct. App. 2009); see also United States v. Trejo, No. 18cr1243, 2018 WL 4853707, at *6 (D.N.M. Oct. 5, 2018); Aguilar v. Filson, No. 12cv315, 2018 WL 3117638, at *30 (D. Nev. June 25, 2018); United States v. Brown, 484 F. Supp. 2d 985, 994 (D. Minn. 2007). Moreover, a defendant's expectation of privacy is not

made legitimate when, as here, the defendant is invited to such a place. See Schram, 901 F.3d at 1045-46; Cortez-Dutrieville, 743 F.3d at 884-85.

In this case, it is questionable whether the defendant had a subjective expectation of privacy. Fluellen testified that the defendant initially ignored her request to watch her children because he did not want to communicate with her or go to her apartment in light of the protective order against him. Indeed, the defendant hid in the closet when the officers arrived at the apartment. See Stephenson, 760 N.W.2d at 25 ("[I]f appellant had a subjective expectation of privacy in his home it is unlikely he would have hidden in the bathroom when [an officer] knocked on the door to gain entry to the residence."). The defendant was well aware that he was forbidden by court order from being in Fluellen's apartment.

In any event, it is clear that the defendant had no objectively reasonable expectation of privacy in the apartment. An objectively reasonable expectation of privacy – one that society is ready to recognize as reasonable – is one that the law accepts. See Cortez-Dutrieville, 743 F.3d at 884 (stating that society is not prepared to recognize an expectation of privacy for trespassers, squatters, or any others who occupy a piece of property unlawfully). As another court stated when considering circumstances mirroring those here, "It is simply

nonsense to say that society is prepared to recognize [the defendant's] right to be where society by the processes of the law has ordered him not to be." Morrison, 710 N.E.2d at 586.

The defendant points out that in United States v. Byrd, 138 S. Ct. 1518, 1527 (2018), the Supreme Court refused to draw a per se rule against an expectation of privacy where the defendant operated a rental car that he was not authorized to operate. However, the Ninth Circuit Court of Appeals persuasively distinguished Byrd from a situation involving the violation of a protective order:

> In Byrd, the Court held that a defendant who had not signed a rental car agreement may still have a legitimate privacy expectation in the rental car to challenge its search. But in so holding, the Court explicitly left intact its conclusion from Rakas that a "car thief would not have a reasonable expectation of privacy in a stolen car," "[n]o matter the degree of possession and control." To explain the difference between the defendant in Byrd and a car thief, the Court likened a car thief to Rakas's hypothetical "burglar plying his trade in a summer cabin during the off season," thus reaffirming Rakas's teaching that, like a defendant who may not challenge a search of stolen property, a defendant whose presence on a premises violates the law may not "object to the legality of [the premises'] search."
>
> Like a burglar, trespasser, or squatter, an individual violating a court no-contact order is on property that the law prevents him from entering. We therefore hold that such an individual lacks a legitimate expectation of privacy in that place and may not challenge its search on Fourth Amendment grounds.

Schram, 901 F.3d at 1046 (citations omitted). The defendant has no standing to claim that the officers' search violated his Fourth Amendment rights.

### III.

In addition to the defendant's lack of standing, the defendant's motion to suppress must also be denied on the merits because the officers' search complied with the Fourth Amendment. The search at issue was not conducted pursuant to a warrant; rather, the inquiry centers on whether Fluellen provided valid consent to the search. For a warrantless search justified upon consent to be valid, the consent must be "freely and voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)); United States v. Snype, 441 F.3d 119, 130-31 (2d Cir. 2006). Whether a consent to a search "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. A consent coerced by threats or force, or granted only in submission to a claim of lawful authority, is not valid. Id. at 233.

Based on the credible testimony given by the Government witnesses at the evidentiary hearing in this case, Fluellen gave voluntary, uncoerced verbal consent when the officers asked to enter the apartment. Contrary to the defendant's contention

otherwise, Detective Faulkner's telling Fluellen that he "needed" to speak to the defendant is not sufficient to overbear Fluellen's will to refuse the officers entry. The officers' testimony that Fluellen consented to the search of the apartment after she had taken the time to get dressed was wholly credible. It was also wholly credible that the officers waited for a written consent-to-search form before doing a thorough search of the apartment. As the hearing demonstrated, oral consent to search is more easily denied than a signed consent form.

Moreover, Fluellen signed the consent-to-search form freely and voluntarily. The defendant claims that Fluellen's signature was not given voluntarily because Detective Faulkner told her that he could get a warrant when he in fact could not and stated that the Administration for Child Services gets involved in cases where a firearm is found in an apartment with children present. First, Detective Faulkner does not recall whether he made either statement, and Fluellen's recount of the events is not credible. In any event, neither statement is incorrect. Merely four days before the search, an identified individual, who had just received a message from the defendant picturing firearms, informed officials that the defendant was staying at the apartment and kept a firearm in the apartment. And Fluellen herself testified that she knew the Administration for Child Services might get involved when there are issues, like the

presence of firearms, concerning children in a residence. Tr. 190; cf. United States v. Deas, No. 17cr719, 2018 WL 3023282, at *8 (S.D.N.Y. June 15, 2018) (finding valid consent where officers "threatened to obtain a search warrant if [the defendant] did not provide his consent and advised him that there could be consequences for [his girlfriend and her] child" if the officers found a firearm); Bartee, 2013 WL 6164339 at *10 ("[N]otifying a party that a warrant could be obtained does not constitute impermissible coercion.").

Finally, the defendant argues that the presence of five officers was an unnecessary and coercive showing of force, rendering her signature on the consent-to-search form invalid. This argument is meritless. See Snype, 441 F.3d at 131 (holding that consent to search was given voluntarily even though a "heavily armed SWAT team . . . initially secured [a couple] in handcuffs and raised the possibility of taking the couple into custody while placing [the consenter's] young daughter in protective care").

The officers received valid verbal consent from Fluellen to enter and search the apartment after she returned from getting dressed. Fluellen then reaffirmed her consent by freely and voluntarily signing a consent-to-search form, which informed her of her right to refuse consent. The officers' conduct did not

run afoul of the Fourth Amendment and the firearms were legally obtained.

Similarly, because there is no basis to suppress the fruits of the search of Fluellen's apartment, there is no merit to the defendant's argument that his subsequent statements should be suppressed because they were the fruits of an unlawful search. The defendant has no standing to challenge the search and the search was not unlawful.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendant's motion to suppress is **denied**.

The Clerk of Court is directed to close Docket Numbers 12, 17, and 24.

**SO ORDERED.**

**Dated:** **New York, New York**
**January 18, 2019**

_____
John G. Koeltl
**United States District Judge**